John ROSE; Stephen Rose; Tom Burnham; Oliver Coppedge; John Starnes; John McCord; Glenda Lee Coppedge; Billy Crosskno; Chris Crosskno; Judy Crosskno; Roy A. Gaines; R.D. Jackson; Kenny Jackson; Charles Richard Haynes; W.T. Moody; Greg Alexander; George A. Hale III; Margery Hale; Bill Griggs; John R. Taylor; Kent Gipson; Shannon Sanders; Jerry Lyn Sanders; Jerry D. Qualls; Leon Brothers; Ronnie Burks; Jerry Nall; Bob Nall; Wesley Davis; Joe Davis; John Nelson; Billy Joe Nelson; John Ed Regenold; Edward Regenold; Dixie Regenold; Dale Regenold; Leigh Regenold Clower; Harvey Faulkner; Harvey E. Faulkner; Ray Dixon; Snowden Hawkins; Clark Long Sr.; Sarah Long; Clark Long Jr.; Rebecca Long; Nathan Long; Amy Long; The Rose Co.; Coppedge Farms, LLC; GLC Farms, LLC; CC&L Farms, LLC; Starnes Farm & Seed, Inc.; Haynes Farm Partnership; Billy Crosskno & Sons Farms; L. & A. Brothers Family Limited Partnership; E.M. Regenold Estate; Individually and as Representatives of All Landowners and Cotton Producers in Mississippi County and Eastern Craighead County, Arkansas, *Appellants v.*
ARKANSAS STATE PLANT BOARD, *Appellee*

Lee Wilson & Company; Lowrance Gin & Supply Company, Inc.; Rabbit Ridge Gin & Warehouse, LLC; Shawnee Village Gin, LLC; and E. Ritter & Company, *Intervenors*

04-818     213 S.W.3d 607

Supreme Court of Arkansas
Opinion delivered September 22, 2005

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Allan Gates* and *Marcella J. Taylor*, for appellants.

*Cross, Gunter, Witherspoon & Galchus, P.C.*, by: *Allen Dobson* and *Brandon Lacy*; and *Mike Beebe*, Att'y Gen., by: *Arnold M. Jochums* and *Eric Walker*, Ass't Att'ys Gen., for appellee.

*Quattlebaum, Grooms, Tull & Burrow, PLLC*, by: *E. B. Chiles IV* and *Jennifer L. Wethington*, for intervenors.

DONALD L. CORBIN, Justice. This case involves a challenge to the authority of the Arkansas State Plant Board to issue regulations requiring commercial cotton growers in certain designated zones of this state to participate in a program to suppress and eradicate the boll weevil and to share the costs of such a program,

without having first received approval by referendum. Appellants are commercial growers of cotton in the Northeast Delta Zone (NEDZ), which is situated in Mississippi County and the eastern part of Craighead County. Appellee is the Arkansas State Plant Board. Intervenors are also commercial cotton growers from the NEDZ, but they favor the Board's action. Appellants filed suit in the Pulaski County Circuit Court arguing that the Board's regulation was not authorized under the Arkansas Boll Weevil Suppression Eradication Act (the Boll Weevil Act), Ark. Code Ann. §§ 2-16-601 to -617 (Repl. 1996 and Supp. 2005). Alternatively, Appellants asserted that provisions of the Act were unconstitutional. The trial court entered judgment in favor of the Board and Intervenors, and this appeal followed. Our jurisdiction of this case is pursuant to Ark. Sup. Ct. R. 1-2(b)(6). We find no error and affirm.

*Facts and Procedural History*

The General Assembly passed the Boll Weevil Act in 1991after determining that "the boll weevil is a public nuisance, a pest, and a menace to the cotton industry" of this state. *See* section 2-16-602(a). The Act's stated purpose is "to secure the suppression or eradication of the boll weevil and to provide for certification of a cotton growers' organization to cooperate with state and federal agencies in the administration of any available cost-sharing programs for the suppression or eradication of the boll weevil." Section 2-16-602(b). The Act specifically authorizes the Board "to carry out programs to suppress or eradicate the boll weevil in this state." Section 2-16-606. It further grants the Board authority to enter cotton fields and cotton processing facilities in this state without a warrant in order to carry out suppression or eradication activities, including inspection, monitoring, treatment with pesticides, and destruction of plants. Section 2-16-607. The Board is also granted authority to promulgate regulations quarantining any part of the state and regulating the movement and storage of such quarantined plants as is necessary, or appears reasonably necessary, to prevent or retard the spread of the boll weevil. Section 2-16-609.

Section 2-16-610 gives the Board authority to make regulations designating particular eradication zones throughout the state and mandating commercial cotton growers to participate in eradication efforts. Of particular importance in this case is section 2-16-610(b), which provides:

(1) The board may promulgate reasonable regulations regarding areas where cotton cannot be planted within an eradication zone when there is reason to believe it will jeopardize the success of the program or present a hazard to public health or safety.

(2) *The board may issue regulations* prohibiting the planting of noncommercial cotton in such eradication zones, and *requiring that all growers of commercial cotton in the eradication zones participate in a program of boll weevil eradication including cost sharing as prescribed in the regulations*. [Emphasis added.]

Section 2-16-610(d) also grants the Board the authority to set penalty fees, not to exceed a charge of $25 per acre, to be assessed when growers in designated eradication zones do not meet the requirements of Board regulations pertaining to the reporting of acreage and participation in cost sharing of the eradication program. Subsection (e) provides that when a grower fails to meet the requirements of the eradication regulations, the Board may destroy cotton not in compliance with such regulations.

Section 2-16-612 provides that the Board may certify a cotton growers' organization (CGO) for the purpose of contracting with the state or other jurisdictions to carry out the purposes of the Act. That section also provides specific requirements for the CGO.

Section 2-16-614, which is also at issue in this case, provides that the CGO may request the Board to authorize a referendum to determine whether an assessment should be levied upon the cotton growers to offset the cost of boll-weevil-eradication programs. Subsection (a) provides:

(1) *At the request of the certified cotton growers' organization*, the State Plant Board shall authorize a referendum among cotton growers in a designated region on the question of whether an assessment shall be levied upon cotton growers in that region to offset, in whole or in part, the cost of boll weevil suppression, preeradication, eradication, or maintenance programs authorized by this subchapter or any other law of this state.

(2) The program shall be designed on a regional basis so as to reflect the differences in boll weevil infestation and the relative costs of financing boll weevil suppression and eradication programs in the respective regions. [Emphasis added.]

Passage of the referendum requires approval by two-thirds of those voting in the referendum. Section 2-16-614(c)(4). Subsection (b) provides that any assessment "levied under this subchapter," or under the Act, shall be based upon the number of acres of cotton planted in the eradication zone and shall not exceed $50 per acre.

Section 2-16-614(d)(1) provides that "assessments approved under the subchapter" shall be collected from the affected cotton growers by the CGO or other entity designated by the Board. Subsection (d)(2) provides that "[t]he assessments collected by the board or such other agency or entity designated by the board under this subchapter" shall be promptly remitted to the CGO. Subsection (f) then specifically provides that "[t]he assessments collected by the board under this subchapter shall not be state funds."

Section 2-16-615 states that the CGO shall bear all expenses incurred in conducting any referenda that it may request, including the costs of furnishing ballots and arranging for the necessary poll holders. Section 2-16-616 provides that in the event a referendum fails, the CGO may call other referenda, with the consent of the Board. After the passage of a referendum, "the eligible voters shall be allowed by subsequent referenda to be held upon recommendation of the certified cotton growers' organization to vote on whether to eliminate or modify the [eradication] program." Section 2-16-616(b)(1).

Finally, section 2-16-617 provides for per-acre penalties for the failure to pay any assessments levied under the Act. It further gives the Board the authority to petition the circuit court to order condemned and destroyed as public nuisances any cotton plants growing on acreage of persons who have failed to timely pay the assessments, including penalties. The Board may also secure a lien on such cotton plants. On the other hand, section 2-16-617 requires the Board to establish by regulation a procedure in which a cotton grower may apply for exemption from payment of such levied assessments on the basis that the payment will impose an undue financial hardship on the grower. The determination of whether a grower qualifies for such an exemption lies with the CGO, whose determination on the matter is final and binding on the grower.

In the present case, the CGO, the Arkansas Boll Weevil Eradication Foundation (the Foundation), made four separate attempts to gain the cooperation of the cotton growers in the NEDZ in order to establish a mandatory eradication program.

Each of these referenda was approved by a majority of the voters, but failed to achieve the two-thirds majority required under section 2-16-614. In March 2003, at the request of the Foundation, the Board's Boll Weevil Committee met to discuss alternative methods and ways to implement an eradication plan for the NEDZ. The Committee proposed passage of a regulation imposing an eradication plan and assessment for the NEDZ at a cost of $6 per acre. During a board meeting on April 9, 2003, the Board reviewed the matter and formally proposed adoption of the regulation, provided that the assessment was set at $8 per acre, which amount was based on the cost estimates submitted by the Foundation. Notice was then provided to the cotton growers in the NEDZ, and both written and oral comments were considered by the Board at its May 22, 2003 meeting. At the conclusion, the Board voted to adopt the proposed regulation.

Thereafter, Appellants brought suit against the Board claiming an illegal exaction on behalf of the class of cotton growers affected by the assessments. Their primary claim was that the Board lacked authority to impose an eradication assessment without referendum approval by two-thirds of the voting cotton growers in the NEDZ. Alternatively, they also claimed that (1) the statute giving the Board such authority was an unconstitutional delegation of legislative authority; (2) the statute was an unconstitutional delegation of taxing authority; (3) the regulation violated the growers' rights to equal protection and due process; and (4) in passing the regulation, the Board acted arbitrarily and capriciously.

The first issue, relating to the Board's authority to impose the per-acreage assessment without referendum approval, was argued to the trial court in a motion for summary judgment brought by the Board and joined by the Intervenors. After hearing argument from all parties, the trial court issued a written order granting the Board's motion. The remaining issues were then tried before the bench, with the trial court finding in favor of the Board on all claims. This appeal followed.

## I. Board's Authority to Impose Assessment without Referendum Approval

For their first point on appeal, Appellants argue that the trial court erred in granting partial summary judgment on the issue of the Board's authority to impose assessments to offset the costs of a mandatory boll-weevil-eradication program. They contend that the only time the Board may impose such fees is following a referendum in which two-thirds of the voting growers approve the

assessments, pursuant to section 2-16-614. They contend that the Board's authority under section 2-16-610, to issue regulations requiring all the commercial cotton growers in the eradication zone to share the costs of an eradication program, only comes into play after a successful referendum. Thus, they argue that a referendum under section 2-16-614 is required before any assessment may be levied under section 2-16-610.

The Board asserts that sections 2-16-614 and 2-16-610 create two entirely different and separate means to impose assessments on growers to fund the eradication program. It contends that section 2-16-614 provides authority for the growers to take action, while section 2-16-610 allows the Board to act on its own. It asserts that any other interpretation of these provisions dilutes its power to carry out the stated purpose of the Boll Weevil Act, which is the eradication and suppression of the boll weevil.

The trial court found that section 2-16-610 appears to give the Board unconditional authority to assess fees to growers for boll weevil eradication. However, it found that when that section was read in conjunction with section 2-16-614, the Act became ambiguous. Based on this finding, the trial court looked to the legislative intent behind the Act and concluded that the primary goal of the Act is to effectuate the eradication of the boll weevil. Another purpose it found was the legislature's desire to structure the program in such a way as to take maximum advantage of federal monies available to defray the costs to the state and the growers. With these purposes in mind, the trial court concluded that it was illogical to interpret the Act in a way to limit the Board's authority to proactively initiate eradication and assess cost sharing on a zone-wide basis due to a failed referendum. The trial court further agreed with the Board that "[t]he referendum section is in place to give growers a means to prod the Board into action when necessary and to give growers and the Board a means to secure federal dollars when possible."

We begin our analysis of this point by observing that we review issues of statutory interpretation *de novo*, as it is for this court to decide what a statute means. *Baker Refrigeration Sys., Inc. v. Weiss*, 360 Ark. 388, 201 S.W.3d 892 (2005); *Monday v. Canal Ins. Co.*, 348 Ark. 435, 73 S.W.3d 594 (2002). Thus, although we are not bound by the trial court's interpretation, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. *Id.*

The basic rule of statutory construction is to give effect to the intent of the legislature. *Ward v. Doss*, 361 Ark. 153, 205 S.W.3d 767 (2005); *Arkansas Tobacco Control Bd. v. Santa Fe Natural Tobacco Co., Inc.*, 360 Ark. 32, 199 S.W.3d 656 (2004). Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. *Id.* In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* We construe the statute so that no word is left void, superfluous or insignificant, and we give meaning and effect to every word in the statute, if possible. *Id.* However, when a statute is ambiguous, we must interpret it according to the legislative intent, and our review becomes an examination of the whole act. *Id.* We reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part. *Id.* We also look to the legislative history, the language, and the subject matter involved. *Id.* Additionally, statutes relating to the same subject are said to be *in pari materia* and should be read in a harmonious manner, if possible. *Arkansas Soil and Water Conservation Comm'n v. City of Bentonville*, 351 Ark. 289, 92 S.W.3d 47 (2002); *Monday*, 348 Ark. 435, 73 S.W.3d 594.

With these rules in mind, we conclude that the plain language of sections 2-16-610 and 2-16-614 unambiguously demonstrate that the Board had the authority to issue the regulation in question. Section 2-16-610(b)(2) specifically authorizes the Board to issue regulations "requiring that all growers of commercial cotton in the eradication zones participate in a program of boll weevil eradication *including cost sharing* as prescribed in the regulations." (Emphasis added.) There is no limiting language making the Board's authority dependent upon referendum approval. Likewise, there is no language in section 2-16-614 to suggest that the Board is powerless to act without referendum approval. Subsection (a)(1) makes clear that the referendum procedure is a tool available to the CGO that may be used, as the trial court reasoned, to prod the Board into taking action if such prodding should be necessary. The introductory language to that provision is "At the request of the certified cotton growers' organization." However, the remainder of section 2-16-614 addresses assessments levied or approved "under this subchapter." This language demonstrates that assessments approved by referendum are not the only assessments that may be imposed. Indeed, this is made clearer by the fact that

subsection (d) of section 2-16-614 refers separately to assessments collected by the CGO and assessments collected by the Board.

Accordingly, we affirm the trial court's grant of summary judgment to the Board on the issue of the Board's authority to pass, without referendum approval, a regulation requiring the growers in the NEDZ to participate in an eradication program and to share the costs thereof. The statutes at issue plainly authorize the Board to take the action it took in this case. There is simply nothing on the face of the Act itself tending to limit the Board's authority in requiring mandatory participation in an eradication program, including cost sharing, to such instances in which a program has already been approved by the growers in the affected zone. Had the legislature wished to place such a limitation on the Board's power, it could easily have done so.

## II. Unconstitutional Delegation of Legislative Authority

For their second point on appeal, Appellants argue that if the Board is found to have possessed the power to impose the assessments under section 2-16-610, then that section amounts to an unconstitutional delegation of legislative authority to an agency of the executive branch. We find no merit to this point.

This court has held that discretionary power may be delegated by the legislature to a state agency so long as reasonable guidelines are provided. *Holloway v. Arkansas State Bd. of Architects,* 352 Ark. 427, 101 S.W.3d 805 (2003); *McQuay v. Arkansas State Bd. of Architects,* 337 Ark. 339, 989 S.W.2d 499 (1999). These guidelines must include appropriate standards by which the administrative body is to exercise this power. *Id.* A statute which in effect reposes an absolute, unregulated, and undefined discretion in an administrative agency bestows arbitrary powers and is an unlawful delegation of legislative powers. *Id.* As the parties challenging the legislation, it is Appellants' burden to prove its unconstitutionality, and all doubts will be resolved in favor of the statute's constitutionality, if it is possible to do so. *See City of Cave Springs v. City of Rogers,* 343 Ark. 652, 37 S.W.3d 607 (2001). An act will be struck down only when there is a clear incompatibility between the act and the constitution. *Id.*

Appellants contend that section 2-16-610 does not provide any guidelines for levying assessments. They assert that it does not guide the Board in determining when assessments may be imposed, what amount is appropriate, how the assessment is to be

allocated, or what use may be made of the proceeds. They concede that such guidelines are provided in section 2-16-614; however, they contend that those guidelines only apply to assessments levied pursuant to the referendum process.

The Board, on the other hand, asserts that the guidance provided in section 2-16-614 govern any assessments levied under the Act. To support this, the Board points to the language in subsection (b)(1) specifically referring to "[t]he assessment levied under this *subchapter*[.]" (Emphasis added.) Additionally, subsection (d)(1) speaks to "[t]he assessments approved under this *subchapter*," and (d)(2) provides for assessments collected by the Board "under this *subchapter*[.]" (Emphasis added.) We agree with the Board that the guidelines set out in those provisions apply to assessments levied by the Board under section 2-16-610, and we conclude that such guidelines are reasonable.

██ Under section 2-16-614(b), the Board is told that the assessment shall be based upon the number of acres of cotton planted in the eradication zone, and that the annual amount shall not exceed $50 per acre. Subsection (d) provides that the assessments shall be collected by the certified growers' organization or other such entity designated by the Board and remitted to the growers' organization. Subsection (e) requires the growers' organization to account for its use of the assessments, by requiring it to provide to the Board an annual audit of its accounts. Subsection (f) designates these assessments as not being state funds. These provisions combined with the notice provision set out in section 2-16-610(c) provide sufficient reasonable guidelines for the Board to pass regulations requiring commercial cotton growers in eradication zones to participate in an eradication program and share the costs of such program. We thus affirm on this point.

### III. Unconstitutional Delegation of Taxing Authority

For their third point on appeal, Appellants argue that if this court concludes that the eradication assessments imposed by the Board without referendum approval are authorized by section 2-16-610, then that statute is an unconstitutional delegation of taxing authority by the legislature. The Board asserts that this argument is without merit and should be summarily rejected on the ground that the assessments levied by it are not taxes as that term has been defined by this court. We agree with the Board.

"The distinction between a tax and a fee is that government imposes a tax for general revenue purposes, but a fee is imposed in the government's exercise of its police powers." *City of Marion v. Baioni*, 312 Ark. 423, 425, 850 S.W.2d 1, 2 (1993) (citing *City of North Little Rock v. Graham*, 278 Ark. 547, 647 S.W.2d 452 (1983)). A fee may be assessed for providing a service without obtaining public approval. *Harris v. City Little Rock*, 344 Ark. 95, 40 S.W.3d 214 (2001); *Barnhart v. City of Fayetteville*, 321 Ark. 197, 900 S.W.2d 539 (1995). In order not to be denominated a tax by the courts, a governmental levy of a fee must be fair and reasonable and bear a reasonable relationship to the benefits conferred on those receiving the services. *Harris*, 344 Ark. 95, 40 S.W.3d 214; *City of Marion*, 312 Ark. 423, 850 S.W.2d 1. The fact that the levy is labeled a "fee," not a "tax," is not binding, and this court looks to the true character of the levy to determine which it is. *Id.*

Here, the assessments are only charged to those persons who will directly benefit from the eradication program, namely the cotton growers in the eradication zone. The monies collected are not deposited in the general revenues of this state or combined with the Board's revenues; rather, they are either directly collected by the CGO or collected by the Board and promptly remitted to the CGO "under such terms and conditions as the board shall deem necessary to ensure that the assessments are used in a sound program of eradication or suppression of the boll weevil." Section 2-16-614(d)(2). In other words, that fees are used to pay for the costs of the eradication program. Moreover, the fees do not exceed the estimated costs proposed by the CGO, and they bear a reasonable relationship to the benefits conferred on the growers. Accordingly, we affirm the trial court's conclusion that the fees levied by the Board under the Act are not taxes and that, therefore, section 2-16-610 is not an unconstitutional delegation of taxing authority.

### IV. Equal Protection

For their fourth point on appeal, Appellants offer the alternative argument that the regulation authorizing the imposition of eradication assessments without referendum approval violates their rights to equal protection for two reasons: (1) it discriminates against Appellants on the basis of their viewpoint; and (2) it treats them differently from cotton growers in other zones who, because they authorized the assessments via referendum, have the right to recall or modify the assessments under section 2-16-616.

■ Regarding their first claim of discrimination, Appellants suggest that the test to apply to this issue is that of strict scrutiny, as they claim that a fundamental right is at stake, namely their right to hold a certain viewpoint on the mandatory eradication of boll weevils. They then cite two cases from federal courts that invalidated assessments on farmers used to fund *advertising* and *marketing* programs with which they disagreed. Those cases are inapposite, as there is no similar free-speech issue implicated in this case. The assessments levied by the Board are not for the purpose of funding any marketing or advertising campaign and in no way infringe upon Appellants' right to hold a contrary viewpoint. Accordingly, we reject this discrimination claim.

As for the second claim, that the Board's actions result in their being treated differently from cotton growers in other zones that approved their assessments via referendum, we find no constitutional violation. On this claim, no fundamental right, such as free speech or suspect classification is at issue. Therefore, the correct test to apply is the rational-basis test.

The equal protection clause permits classifications that have a rational basis and are reasonably related to a legitimate government purpose. *Otis v. State*, 355 Ark. 590, 142 S.W.3d 615 (2004); *Smith v. State*, 354 Ark. 226, 118 S.W.3d 542 (2003). Equal protection does not require that persons be dealt with identically; it only requires that classification rest on real and not feigned differences, that the distinctions have some relevance to the purpose for which the classification is made, and that their treatment be not so disparate as to be arbitrary. *Id.* When reviewing an equal-protection challenge, it is not this court's role to discover the actual basis for the legislation. *Id.* Rather, we consider whether there is any rational basis that demonstrates the possibility of a deliberate nexus with state objectives so that legislation is not the product of arbitrary and capricious government purposes. *Id.* If a rational basis exists, the statute or, in this case, the regulation, will withstand constitutional challenge. *Id.* Under the rational-basis test, legislation is presumed constitutional and rationally related to achieving any legitimate governmental objective under any reasonably conceivable fact situation. *Eady v. Lansford*, 351 Ark. 249, 92 S.W.3d 57 (2002). The burden is on the party challenging the legislation to prove its unconstitutionality. *Id.*

■■ In the present case, we agree with the trial court that the legislature established the legitimate governmental objective of

ridding this state of the destructive force of the boll weevil. The Boll Weevil Act and the powers it delegates to the Board are rationally related to achieving this objective, and Appellants have failed to prove otherwise. Their claim that they are being treated differently from the cotton growers in the state's other eradication zones who have the ability to modify or recall the assessments in a subsequent referendum is not well taken. There is no equal protection violation stemming from the mere fact that the Act authorizes growers who elect to implement an eradication program to later elect to modify or recall that program. As stated above, the Act creates two separate means for achieving the legitimate purpose of eradicating the boll weevil — one for the growers and one for the Board. The Board's power to impose an eradication program remains and is independent of any action taken by the growers. Accordingly, all the commercial cotton growers of this state are subject to the same authority. We thus affirm on this point.

### V. Arbitrary and Capricious Actions

Finally, Appellants argue that the Board's imposition of eradication assessments on them was arbitrary, capricious, and an abuse of the agency's discretion. We do not address the merits of this point, as Appellants offer no citation to legal authority, nor do they make any convincing argument to support this point. This court has steadfastly refused to consider an issue raised that is not supported by convincing argument or citation to authority. *See, e.g., Ouachita R.R., Inc. v. Circuit Court of Union County*, 361 Ark. 333, 206 S.W.3d 811 (2005); *Fred's, Inc. v. Jefferson*, 361 Ark. 258, 206 S.W.3d 238 (2005); *City of Greenbrier v. Roberts*, 354 Ark. 591, 127 S.W.3d 454 (2003). In any event, given our conclusion that the regulation is rationally related to the legislative purpose of the Act, we would be hard pressed to conclude that the Board's action was arbitrary, capricious, or an abuse of discretion.

Affirmed.

WILLIAM J. WYNNE, Special Justice, joins in this opinion.

BROWN, J., not participating.